IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA A. STOCKDALE, | ) | Case No. 1:16-cv-2304 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      Introduction

Plaintiff Cynthia A. Stockdale seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supported the Commissioner's disposition of plaintiff's application before the Commissioner, I recommend that the final decision of the Commissioner be **AFFIRMED**.

## II.      Procedural History

Plaintiff protectively applied for DIB on August 14, 2013.  (Tr. 150)  Ms. Stockdale alleged that her disability began on September 3, 2012.  (Tr. 150)  Plaintiff's application was denied initially and after reconsideration.  (Tr. 104, 113)  On February 7, 2014, plaintiff requested an administrative hearing.  (Tr. 120)

Administrative Law Judge Tammy Georgian. ("ALJ") heard the case on May 5, 2105. (Tr. 27-76)  The ALJ denied plaintiff's applications for benefits on June 12, 2015.  (Tr. 10-22) Plaintiff requested review of the ALJ's decision on August 6, 2015.  (Tr. 6)  The appeals council denied review in a decision dated July 26, 2016 (Tr. 1), rendering the ALJ's decision the final decision of the Commissioner.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Ms. Stockdale was 56 years old at the time of her administrative hearing.  (Tr. 150)  She completed high school and has past work experience as an accounting clerk, an order clerk and administrative assistant.  (Tr. 18, 35-38)

### B.    Medical Evidence

Plaintiff's primary care doctor, David C. Parris, diagnosed plaintiff with depression.  She saw him on July 10, 2009 (more than three years before the alleged disability onset date) to follow up on this condition.  Plaintiff reported feeling "OK" and denied having any crying spells.  Dr. Parris discussed plaintiff's prescriptions with her and noted that her depression was stable. (Tr. 464)

Plaintiff returned to Dr. Parris on September 26, 2009 with a cough and congestion.  Dr. Parris noted that plaintiff was doing well on Pristiq and that she had "no depression."  She was still looking for a job. (Tr. 463)  On September 21, 2011, Dr. Parris continued to note that Pristiq was helping with plaintiff's depression. (Tr. 462)

On July 23, 2012, plaintiff met with Dr. Parris for medication refills.  She still was taking Pristiq and took Lorazepam every couple of days.  She denied any dyspnea at rest or exertion, chest pain, palpitations, or edema.  (Tr. 461)

Plaintiff was admitted to the hospital on September 3, 2012 for a myocardial infarction of her acute interior wall. (Tr. 212)  She complained of chest pain and shortness of breath at the emergency room. (Tr. 235)  Plaintiff underwent a left heart catheterization, a coronary artery angiography, followed by stent of the left coronary artery.  (Tr. 209-211)  Before the procedure, plaintiff's left coronary artery was totally occluded; after the procedure occlusion was at 0%.  (Tr. 211)  Two days later, plaintiff had a stent placed in her right coronary artery.  (Tr. 207, 255)

On September 20, 2012, plaintiff returned to the emergency room complaining of weakness, lethargy, and fatigue.  (Tr. 387)  Dr. Shreeniwas Lele admitted Stockdale to the hospital because of severe anemia.  Blood infusions were administered.  (Tr. 387)   Plaintiff followed up with Dr. Lele on September 28, 2012.  She reported that she was back to normal and feeling better overall. (Tr. 459)  She denied any chest pain or shortness of breath. (Tr. 459)  Physical examination returned normal results. (Tr. 459)

From December 8, 2012 to December 13, 2012 plaintiff received in-patient care at Lake Hospital for rectal bleeding.  (Tr. 323)  Plaintiff underwent a colonoscopy and had a small polyp removed.  (Tr. 310)  She had bleeding following the polypectomy, but cauterization stopped the bleeding. (Tr. 310)

Plaintiff had a follow-up appointment with Dr. Lele on December 20, 2012.  (Tr. 457)  Dr. Lele noted that plaintiff was "a happy fellow."  She was doing much better and had no further bleeding or black stool.  She also denied any chest pain or shortness of breath. (Tr. 457)

On January 10, 2013, plaintiff had another follow-up appointment with Dr. Lele.  Plaintiff denied any chest pain or shortness of breath.  With the exception of a small amount of bleeding from a hemorrhoid, her rectal bleeding had stopped.  She did report, however, that she was feeling weak, tired, fatigued and exhausted.  Dr. Lele noted plaintiff's coronary artery disease and

hypertension were stable with her current medications and that her anemia was much better. (Tr. 455)

Plaintiff followed up with Dr. Parris on April 12, 2013.  (Tr. 454)  She denied chest pains or difficulties breathing.  She complained of being tired and forgetful.  She was having hot flashes and was moody.  Dr. Parris told plaintiff she could stop taking iron.  He noted that she was going to start Weight Watchers.  Her weight was 311 pounds. (Tr. 454)

Plaintiff followed up with her cardiologist, Roger Espinosa, M.D., on April 30, 2013.  (Tr. 260)  She denied any cardiac symptoms such as chest pain, shortness of breath, dizziness or fatigue.  (Tr. 260)  Plaintiff's physical exam was normal and she had no neurologic abnormalities. (Tr. 260)

Plaintiff met with Dr. Lele on May 6, 2013 complaining of a swollen right cheek, sinus pain and headache. (Tr. 450)  Plaintiff reported that she was not feeling poorly or tired and she did not have a fever or chills. (Tr. 450)  Plaintiff had a normal physical exam.  Dr. Lele diagnosed facial cellulitis and thought that it might have been caused by dental issues.  He prescribed antibiotics and told her to see her dentist.  (Tr. 453)

Plaintiff followed up with Dr. Parris on July 12, 2013.  (Tr. 446-449) By then, she had been off of iron for three months and had no cough, wheezing or labored breathing.  She had no signs of bleeding.  She reported feeling fatigued.  Plaintiff's weight was 321 pounds.  Plaintiff said she was seriously thinking about going on a diet.  (Tr. 448-449)

Plaintiff saw Dr. Parris again on September 23, 2013 and reported right ankle pain. (Tr. 479)  She denied any chest pain, palpitations, cough or dyspnea.  She did, however, say that she tired easily on steps.  Plaintiff also requested a Plavix refill. (Tr. 479-482)  Plaintiff met with Dr. Parris again on April 10, 2014.  She denied any chest pain or wheezing.  But she reported being

more depressed and weepy.  She weighed 331 pounds.  Dr. Parris noted that plaintiff's mood and affect were normal and she had a normal physical examination. (Tr. 508-511)

Plaintiff next saw Dr. Parris on October 13, 2014.  She had twisted her knee at her daughter's wedding and was still having occasional medial pain.  She reported moodiness and days that she would cry all day.  She denied any chest pain or palpitations; she had no wheezing or dyspnea.  Plaintiff's weight was up to 338 pounds. (Tr. 504-506)  Examination revealed that plaintiff's left knee was "somewhat puffy," non-tender to palpation of the joint space, full range of motion without pain. (Tr. 507)

Plaintiff saw Dr. Parris on April 14, 2015.  She complained of knee pain, ankle pain and finger pain "all the time."  She reported hot flashes along with mood swings and anxiety.  She requested a disabled parking pass due to her joint pain.  She reported low moods and forgetfulness.  She told Dr. Parris she had a disability hearing next week and that her attorney wanted Dr. Parris to complete a disability evaluation.  Plaintiff's weight was 323 pounds. (Tr. 499 – 503)

Plaintiff met with Dr. Espinosa on April 14, 2015 for a follow up appointment for her coronary heart disease. (Tr. 496)  Plaintiff denied any cardiac related symptoms such as chest pain, syncope, fatigue, shortness of breath or dizziness. (Tr. 496)

### C.  Opinion Evidence

#### 1.  Psychological Examination – September 2013

Paul G. Josell, Psy.D, conducted a psychological evaluation on September 17, 2013.  (Tr. 470-473)  Plaintiff reported that she tended to fatigue easily since her heart attack.  She also reported some difficulty with short-term memory, even though it appeared to be intact during the examination.  (Tr. 470)  Plaintiff stated that she had never received any formal mental health treatment, she reported experiencing a major depressive episode and increased anxiety in 2009.

Her primary care physician prescribed medication for these conditions.  Dr. Josell diagnosed major depressive disorder, single episode, partial remission, heart disease, ulcers, high cholesterol hypertension and obesity.  He did not find any work related impairments and assigned a GAF score of 68.  (Tr. 472-473)

### 2.    Non-Examining State Agency Medical Consultants

#### a.    Bruce Goldsmith, Ph.D. – October 2013

Non-examining state reviewing physician, Bruce Goldsmith, Ph.D. reviewed plaintiff's records on October 3, 2013.  (Tr. 81-83)  Dr. Goldsmith opined that plaintiff had no restrictions in her activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (Tr. 83)

#### b.    Robelyn Marlow, Ph.D. – February 2014

On February 3, 2014, Dr. Robelyn Marlow reviewed plaintiff's file and affirmed the opinions expressed by Dr. Goldsmith. (Tr. 96)

#### c.    Michael Lehv, M.D. – October 2013

On October 7, 2013, Dr. Michael Lehv reviewed plaintiff's medical records and opined that she was capable of performing work at the light exertional level, but was limited to standing/walking for only four hours in an eight-hour workday; could not climb ladders, ropes or scaffolds; only occasional balancing; but unrestricted in her ability to perform other postural activities.  She was also required to avoid all exposure to hazards. (Tr. 84-87)

> **d.**      **Sreenivas Venkatachala, M.D. – February 2014**

Dr. Sreenivas Venkatachala also reviewed plaintiff's file on February 3, 2014 and affirmed that plaintiff could perform a reduced range of light work but restricted plaintiff to only occasional postural activities due to her obesity. (Tr. 98-99)

**D.**      **Testimonial Evidence**

**1.**      **Testimony of Cynthia A. Stockdale**

Plaintiff offered the following summarized testimony at the May 5, 2015 ALJ hearing:

- Plaintiff completed high school. (Tr. 35)

- At the time of the hearing, plaintiff was living in a condo with her husband.  (Tr. 33-34)

- She was 5'7" and weighed 322 pounds. (Tr. 46)

- Plaintiff had a driver's license and was capable of driving but she did not like to drive far. (Tr. 35)

- On a daily basis, plaintiff showered, did housework, prepared meals, crocheted and used a computer.  (Tr. 42-43)

- Plaintiff went grocery shopping but her husband brought the groceries into the house. Plaintiff had not tried the riding carts at the grocery store; she felt they were for "old people." (Tr. 44)

- Plaintiff previously worked as an accounting clerk, a customer service representative, and as an administrative assistant. (Tr. 36-38)  Plaintiff was laid off from her previous jobs. (Tr. 45)

- Plaintiff was taking medication for her heart problems; she had a heart attack in 2012. (Tr. 40)

- Plaintiff stated that she had trouble walking.  She estimated that she would be capable of walking for five to ten minutes. (Tr. 39)  She had knee pain when she walked, possibly due to her weight. (Tr. 42)

- The main reason that plaintiff was not able to work was because of her mood swings and anxiety attacks. (Tr. 39)

- Plaintiff described her anxiety attacks as crying spells.  She sometimes cried for two hours at a time. (Tr. 47) Her primary care physician prescribed medication for these impairments; she was not seeing a psychiatrist or a counselor. (Tr. 49)

- Plaintiff had never been hospitalized for an anxiety attack. (Tr. 48)

### 2.  Vocational Expert – Stephen P. Davis

Stephen Davis, a vocational expert ("VE"), also testified.  (Tr. 49-75)

- The VE considered plaintiff's past relevant work to be customer service, accounting clerk and secretary/administrative assistant work. (Tr. 52)

- Plaintiff had some transferable job skills from her past work, like working with numbers, calculations and accounting. (Tr. 54, 61)

- The VE was asked to consider a hypothetical individual of plaintiff's age and education with her past work experience who could do light work; could stand and/or walk for approximately four hours in an eight hour workday; could sit for approximately six hours in an eight hour workday; could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; but could never climb ladders, ropes or scaffolds; could frequently balance and could work in an environment where she was not exposed to hazards such as unprotected heights and moving machinery. (Tr. 54)

- The VE testified that this individual would be able to perform plaintiff's past work as an administrative clerk.  The VE believed the individual could also perform the other two positions previously held by plaintiff (as actually performed), but not according to the job requirements as described in the DOT. (Tr. 54-55)

- The hypothetical individual could also perform the jobs of cashier-parking lot, cashier self-service, and an investigator of dealer accounts.  There were significant numbers of all these jobs in Ohio and nationally.  (Tr. 56-57)

- Plaintiff's attorney then asked that the hypothetical individual be limited to occasional contact with supervisors, coworkers and the public.  The VE testified that, with this additional limitation, the individual would still be able to do the administrative clerk position. (Tr. 58-59)  She could also do the investigator of dealer accounts, but the cashier jobs would be eliminated. (Tr. 59)

- If the hypothetical individual was limited to sedentary jobs, both the administrative clerk and the investigator of dealer accounts would be eliminated.  However, the individual would be able to perform the job of sorter, invoice control clerk, and payroll clerk.  There were significant numbers of these jobs in Ohio and nationally. (Tr. 66)

- The jobs of sorter, invoice control clerk and payroll clerk would not be available to an individual who was limited to simple, routine tasks or to an individual who was limited to less than occasional contact with supervisors, coworkers and the public. (Tr. 67)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

9

claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V. The ALJ's Decision

The ALJ issued a decision on June 12, 2015. A summary of her findings is as follows:

1. Ms. Stockdale was insured through June 30, 2015. (Tr. 12)

2. Ms. Stockdale had not engaged in substantial gainful activity since September 3, 2012, the alleged onset date. (Tr. 12)

2. Ms. Stockdale had the following severe impairments: obesity, cardiomyopathy, and hypertensive vascular disease. (Tr. 12)

3. Ms. Stockdale did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 15)

4. With the exception of brief periods lasting less than 12 continuous months, Ms. Stockdale had the residual functional capacity to perform light work except she could only stand and/or walk for four hours in an eight hour period, she could only occasionally climb ramps and/or stairs, stoop, kneel, crouch and crawl; she was limited to frequent balance; and she could not work around hazards such as unprotected heights and moving machinery; and she could not climb ladders, ropes or scaffolds. (Tr. 15)

5. Ms. Stockdale was capable of performing past relevant work. (Tr. 18)

Based on the foregoing, the ALJ determined that Ms. Stockdale had not been under a disability from September 3, 2012, the alleged onset date. (Tr. 21-22)

## VI.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether substantial evidence in the record supports the ALJ's findings and whether the ALJ applied correct legal standards.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).  The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

11

The court must also determine whether the ALJ applied correct legal standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.  Substantial Evidence Supported the ALJ's Step Three Finding

Plaintiff claims that the ALJ erred at Step Three of her sequential analysis in failing to explain why the claimant did not meet or medically equal the "appropriate Impairment Listing."[2] Plaintiff cites cases holding that a brief, two-sentence consideration of a Listing is inadequate and that summary analysis precludes meaningful judicial review.  *See Barnett v. Barnhart,* 381 F.3d 664, 670 (7th Cir. 2004); *Mathis v. Astrue,* 723 F.Supp.848 (E.D.N.C. 2010); *Reynolds v.*

---

[2] ECF Doc. 12, Page ID# 591.

*Commissioner,* 424 Fed. App'x 411 (6th Cir. 2011); and *Cashin v. Commissioner,* 2013 U.S.

Dist. LEXIS 101307.

Defendant argues that plaintiff did not direct the court to any specific Listing the ALJ

should have analyzed or pointed to medical evidence showing that she met all the criteria for any

Listing.[3]  Defendant also argues that the ALJ's review of the record showed that plaintiff's

physical and mental impairments resulted, at most, in minimal dysfunction. (Tr. 12-18)

At Step Two of her sequential evaluation, the ALJ found that plaintiff's obesity,

cardiomyopathy and her hypertensive vascular disease were severe impairments.  At Step Three,

the ALJ stated:

> The claimant does not have an impairment or combination of impairments that
> meets or medically equals the severity of one of the listed impairments. * * *
>
> The above determination is supported by the opinions of the above-mentioned
> State agency psychologists who reviewed this record that are found in exhibits 1A
> and 3A, and by the opinions of State agency physicians who reviewed this record
> that are also found in exhibits 1A and 3A.  I defer to the opinions of these sources
> because they are considered to be experts in Social Security disability programs
> and because they are uncontradicted in the sense that no acceptable medical
> source has suggested that the claimant has had a listing level impairment(s) at any
> time since the September 3, 2012, alleged onset date.

(Tr. 15)  Plaintiff argues that the Sixth Circuit Court of Appeals decision in *Reynolds v. Comm'r,*

424 Fed. App'x (6th Cir. 2011) requires reversal of the ALJ's decision in this case.

In *Reynolds,* the ALJ found that plaintiff had a physical and mental impairment at Step

Two of his analysis.  At Step Three, the ALJ concluded that claimant did not "have an

impairment or combination of impairments which, alone or in combination, meet sections 1.00 or

12.00 of the Listings." *Id.* at 415.  He then thoroughly analyzed plaintiff's mental impairment

pursuant to the substantial evidence standard but failed to complete his Step Three analysis for

---

[3] ECF Doc. 14, Page ID# 607.

the claimant's physical impairment. *Id.*  The court of appeals found that the ALJ erred by failing to analyze Reynolds' physical condition in relation to the Listed Impairments.  *Id.* at 416.  The court also held that the ALJ's error was not harmless and that correction of the error was not merely formalistic because it was possible, considering the evidence that he had put forth, that Reynold's impairment could meet the Listing. *Id.*

At first glance, the *Reynolds* holding and its progeny appear to be on point and lead to the conclusion that the ALJ here also failed to adequately conduct a Step Three analysis.  However, *Reynolds* has been undermined by more recent Sixth Circuit decisions.  *See Roby v. Colvin*, 2016 U.S. Dist. LEXIS 3924, *8 (W.D. Ky., Jan. 13, 2016).  Current Sixth Circuit law shows how this action must be distinguished from *Reynolds*.  In *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359 (6th Cir. 2014), the Sixth Circuit found that, even if an ALJ did not make sufficient factual findings that an impairment did not meet or medically equal the severity of a Listed Impairment, the error is harmless when the claimant "has not shown that his impairments met or medically equaled in severity any listed impairment" during the relevant time frame. *Id.* at 364, 366.  In applying *Forrest,* the U.S. District Court for the Western District of Kentucky noted that the main question was whether a remand to the ALJ would be pointless, *i.e.*, whether the ALJ's failure to discuss the claimant's physical limitations under a specific listing constituted harmless error. *Roby,* 2016 U.S. Dist. LEXIS at *10.

Similarly, in *Malone v. Comm'r of Soc. Sec.,* 507 F. App'x 470 (6th Cir. 2012), the Sixth Circuit affirmed the district court's decision affirming the ALJ's denial of benefits when the claimant did not argue that he had a listed impairment at his hearing, and the ALJ found that he did not have an impairment or combination of impairments equal or equivalent to a listed impairment. *Id.* at 471, 473.  The court found that the ALJ's determination was supported by

14

evidence in the record, and thus it was unnecessary for the ALJ to make specific findings regarding a particular listed impairment. *Id.* at 472.

Plaintiff had the burden of showing that her impairments were equal or equivalent to a listed impairment. *Id., citing Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001).  To meet that burden she was required to point to specific medical signs and laboratory findings that are at least equal to a listed impairment in duration and severity.  *Id.*  "For a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S. Ct. 885, 107 L.Ed.2d 967 (1990).

Plaintiff has not met that burden in this case.  Plaintiff did not argue that any of her impairments met the listings at the administrative hearing.  Nor does her brief identify what Listing she claims to meet or identified medical evidence to support her argument.

The ALJ's review of the evidence showed that none of plaintiff's impairments interfered with her ability to do unskilled work. The ALJ recognized that plaintiff had a heart attack in September 2012 and underwent a successful heart surgery with associated artery stenting. Plaintiff was described on numerous later occasions as "not being in any physical distress."  The ALJ also placed great significance on the fact that "the claimant had been described on numerous occasions since September 3, 2012, as being neurologically intact, and/or as having normal strength and sensation, and/or essentially normal strength and sensation, in her lower and upper extremities, and/or as having a normal gait." (Tr. 17)

In considering plaintiff's obesity, the ALJ noted that the plaintiff had been able to engage in substantial gainful activity in her past relevant work despite her obesity.  (Tr. 17)  The ALJ

also noted that many of the plaintiff's subjective statements suggested that her impairments were not causing significant functional limitations.

> I have also considered the fact that the claimant described herself on December 20, 2012, as being "a happy fellow" who was "doing much better" and "feeling okay."  The claimant also told a physician on April 30, 2013, that she was not experiencing "any cardiac symptoms such as chest pain, shortness of breath, dizziness or fatigue."  A week later, on May 6, 2013, a physician noted that the claimant was "not feeling poorly, not feeling tired."  I have also taken into consideration the claimant's statement on September 23, 2013, that [she] had "no chest pain or palpations" but that she did "tire easily on steps."  In comparison, on April 10, 2014 the claimant was described as having "mild stable dyspnea on stairs."  * * *  The claimant said on October 13, 2014, that she had had "no chest pain or palpations" or "wheezing or dyspnea."  Most recently, the claimant told a physician on April 14, 2015, that she was not experiencing "any cardiac-related symptoms such as chest pain, syncope, fatigue, shortness of breath, or dizziness."

(Tr. 17-18)  The ALJ also noted that there was no evidence that the claimant had experienced significant, adverse, or ongoing medication side effects. (Tr. 18)  Nor was there any evidence that any treating source had restricted the claimant in terms of basic work activities. (Tr. 18)

The undersigned finds that this case must be distinguished from the cases cited by plaintiff.  Although the ALJ's Step Three analysis was arguably too conclusory, a review of the entire ALJ decision leads to the inescapable conclusion that the ALJ's finding that plaintiff met no listed impairments was supported by substantial evidence.  Therefore, even if the ALJ erred in her Step Three analysis, it was a harmless error.  Plaintiff identified no medical signs or laboratory findings showing that her impairments met or equaled a listed impairment in duration and severity.  Plaintiff did not meet her burden of proof.  The undersigned recommends that the court affirm the ALJ's decision at Step Three.

### C.    Substantial Evidence Supported the ALJ's Evaluation of Plaintiff's Obesity

Plaintiff's second argument relates to her first.  She argues that the ALJ did not properly evaluate or analyze her obesity at Step Three.  As discussed above, the ALJ's alleged failure to

16

provide a more thorough discussion of her Step Three finding was harmless error at worst.

Plaintiff produced no evidence establishing that her obesity, singularly or in combination with

her other impairments, met or medically equaled a listed impairment. There is no evidence that

plaintiff's obesity caused any functional deficits beyond those identified by the ALJ, and she was

previously able to engage in substantial gainful activity despite her obesity. Plaintiff argues that

the ALJ erred by failing to consider SSR 02-01p. However, that policy interpretation ruling on

obesity actually demonstrates why a remand to the ALJ would be pointless in this case. *See*

*Roby,* 2016 U.S. Dist. LEXIS at *10.

> SSR 02-01p, 2002 SSR LEXIS 1, states, in relevant part:
>
> Obesity may be a factor in both "meets" and "equals" determinations.
>
> Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.
>
> * * *
>
> We may also find that obesity, by itself, is medically equivalent to a listed impairment (or, in the case of a child applying under the title XVI, also functionally equivalent to the listings). For example, if obesity is of such a level that it results in the inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence. * * *
>
> We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity

makes it hard for the chest and lungs to expand.  This means that the respiratory system must work hard to provide needed oxygen to the body.  Because the body is working hard at rest, its ability to perform additional work is less than would otherwise be expected.  Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

*However, we will not make assumptions about the severity or functional effects of obesity combined with any other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment*. We will evaluate each case based on the information in the case record.

SSR 02-01p, 2002 SSR LEXIS at **12-15.  (Emphasis added)  Plaintiff argues that the ALJ did not consider SSR 02-01p when evaluating her obesity, but she points to no evidence showing that her obesity increased the severity of her functional limitations beyond those accommodated in the RFC.  The ALJ discussed plaintiff's medical records and pointed to numerous records describing plaintiff as not having any cardiac symptoms.  Plaintiff offered no evidence showing that she had trouble ambulating or that she had other functional limitations due to obesity.  Plaintiff testified that she had a driver's license and was able to drive; she regularly went grocery shopping and refused to use the riding carts at the store, even though she testified that she had trouble walking.  (Tr. 44)  She showered, did housework, prepared meals, crocheted and used a computer on a daily basis.  (Tr. 42, 43)  Plaintiff indicated that her knee hurt when she walked, possibly due to her weight.  (Tr. 42)  However, Stockdale's past relevant work did not require a significant amount of walking, and the ALJ limited plaintiff's RFC to light work with walking limited to four hours.  Plaintiff testified that the main issues that prevented her from working were her mood swings and anxiety attacks.  (Tr. 39)

SSR 02-1p "does not mandate a particular mode of analysis," but it "directs an ALJ to consider the claimant's obesity in combination with other impairments at all states of the

sequential evaluation."  *Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 577 (6th Cir. 2009). The ALJ satisfies this requirement so long as she credits "RFCs from physicians who explicitly accounted for the claimant's obesity."  *Miller v. Comm'r of Soc. Sec.,* 811 F.3d 825, 835 (6th Cir. 2016) (quoting *Coldron v. Comm'r of Soc., Sec.,* 391 F.App'x 435, 443 (6th Cir. 2010))  Here, the ALJ did exactly that – she relied on the medical opinions of the reviewing physicians who explicitly considered plaintiff's obesity and opined that plaintiff was capable of light work with some additional limitations due to her obesity.  (Tr. 85, 98-99)

Plaintiff cites *Shilo v. Comm'r of Soc. Sec.,* 600 F.App'x 956, 959 (6th Cir. 2015), which held that obesity must be considered "at all stages of the sequential evaluation."  However, in *Shilo,* the ALJ's failure to fully evaluate the claimant's obesity was intertwined with his rejection of the treating source opinion, which the court of appeals also criticized.  Here, there is no treating source opinion and no medical opinion indicating that plaintiff had greater functional limitations than determined by the ALJ.  The ALJ satisfied the requirement to evaluate plaintiff's obesity by crediting the RFCs from reviewing physicians who explicitly accounted for the claimant's obesity. *See Miller,* 811 F.3d at 835.

As noted above, plaintiff had the burden of showing that her impairments were equal or equivalent to a listed impairment.  *Malone,* 507 F. App'x at 472.  Plaintiff did not meet that burden in this case.  She has not directed the court to any medical evidence showing that she met or medically equaled any listing.  Nor has she offered any objective medical evidence to show that her obesity, singularly or in combination with her other impairments, met or medically equaled a listed impairment.  The ALJ's failure to more thoroughly evaluate plaintiff's obesity at Step Three of her sequential evaluation was inconsequential.  *See Roby,* 2016 U.S. Dist. LEXIS, at *8; *Forrest,* 591 F.App'x at 364, 366; *Malone,* 507 F. App'x at 472.

### D. Substantial Evidence Supported the ALJ's RFC

Plaintiff also argues that the ALJ did not support her RFC finding with substantial evidence.[4]  Plaintiff contends that the ALJ's reliance on the reviewing physicians' opinions violated the substantial evidence test because the opinions were rendered before plaintiff submitted 32 additional pages of medical records.  Plaintiff also argues that the ALJ did not weigh the reviewing physicians' opinions based on their examining relationship.  Finally, plaintiff argues that the ALJ, who was not a physician, was not permitted to speculate as to the seriousness of the plaintiff's medical condition.[5]

An ALJ's residual functioning capacity determination is proper when it is based upon "all of the relevant medical and other evidence."  20 C.F.R. § 416.945 (a) (3).  At its most basic level, a claimant's residual functional capacity is simply an indication of [her] work-related abilities despite her limitations.  See 20 C.F.R. § 404.1545(a)(1).  The residual functional capacity is not a medical opinion, but an administrative determination reserved to the Commissioner.  See 20 C.F.R. § 404.1527(e)(2).  Accordingly, the ALJ bears the responsibility for determining a claimant's residual functional capacity, based on all of the relevant evidence.  See 20 C.F.R. § 404.1545(a)(3).

Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence.  The substantial evidence standard presupposes that there is a "zone of choice" within which the Agency may proceed without interference from the courts.  *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986).  The ALJ's decision must be affirmed if it is supported by substantial evidence even if the reviewing court would have decided the matter

---

[4] ECF Doc. 12, Page ID# 592.
[5] ECF Doc. 12, Page ID# 593.

differently and substantial evidence also supports a different conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen*, 800 F.2d at 545.

Plaintiff first complains that the ALJ erred in relying on the reviewing physician's opinions because they were formed before all of the medical records were reviewed. After the administrative hearing, plaintiff submitted an additional 32 pages of medical records. (Tr. 496-527) As argued by defendant, "[t]here is no regulation or case law that requires the [administrative law judge] to reject an opinion simply because medical evidence is produced after the opinion is formed." *Mount v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 83358 *29 (S.D. Ohio June 13, 2013) (*quoting Williamson v. Comm'r of Soc. Sec.,* No. 1:11-cv-828, 2013 U.S. Dist. LEXIS 10706, 2013 WL 121813, at *7 (S.D. Ohio Jan. 9, 2013)). "Indeed, the regulations provide only that an [administrative law judge] should give more weight to an opinion that is consistent with the record as a whole." *Id.* (citing 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4)). Here, the ALJ had the opportunity to review the entire record including the additional medical records submitted by plaintiff after the hearing. The ALJ determined that the opinions of the reviewing physicians were supported by the evidence in the record and noted that they were uncontradicted. (Tr. 18) Plaintiff's additional medical records do not contradict the opinions formed by the reviewing physicians. These records show little change in plaintiff's medical condition and contain additional notes stating that plaintiff was not having any cardiac related symptoms. (Tr. 496, 508) Indeed, plaintiff does not argue otherwise. Nor does she identify what information in these records contradicts the findings of the reviewing physicians. Consequently, this argument is unpersuasive as applied to the facts of this case.

Plaintiff next argues that the ALJ improperly weighed the reviewing physicians' opinions because they were not examining sources. Plaintiff cites 20 C.F.R. 404.14527(c) which provides

factors to be considered in weighing medical opinions, including whether the opinion is from an examining source.  The regulation states that more weight is given to "the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." *Id.*  However, plaintiff does not specifically indicate how the ALJ improperly weighed the opinions here.  The fact that the reviewing physicians were non-examining sources is a factor to be considered.  However, in this case, there were no opinions from examining sources.  Thus, this is not a case in which the ALJ improperly assigned more weight to the opinion of a non-examining source than to an examining one.  And it is otherwise unclear why plaintiff believes the ALJ did not apply the factors stated in 20 C.F.R. 404.14527(c).  This argument also lacks merit.

Finally, plaintiff cites cases holding that the ALJ cannot speculate about the seriousness of the claimant's medical condition.  *See Liskowitz v. Astrue, 559 F.3d 736 (7th Cir. 2009); Smith v. Califano,* 637 F.2d 968 (3rd Cir. 1981); *Lund v. Weinberger,* 520 F.2d 782, 785 (8th Cir. 1975); *Kent v. Schweiker,* 710 F.2d 110 (3rd Cir. 1983); and *Reed v. Sec. of HHS,* 804 F.Supp. 914, 919 (E.D. Mich. 1992).  But plaintiff never explains how the ALJ speculated about the seriousness of her impairments, and it is certainly not apparent from reviewing the ALJ's decision.  The ALJ fully considered the medical evidence in the record and assigned great weight to the reviewing physicians' opinions, which were uncontradicted.  The ALJ was not required to speculate on the seriousness of plaintiff's impairments because she relied on opinions from physicians, which she incorporated into her RFC finding.

VII.    **Recommendation**

The court should find that the ALJ properly considered and weighed the evidence, including the medical opinion evidence; that she properly determined that plaintiff did not meet

or medically equal the criteria for a listed impairment; and that she properly determined

plaintiff's residual functional capacity.  The court should further find that substantial evidence

supported the ALJ's decision and that Ms. Stockdale has not demonstrated a basis upon which to

reverse or remand the Commissioner's decision.  Accordingly, I recommend that the final

decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: June 19, 2017

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  *See
U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).